Filed 2/28/14  In re A.F. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.F. et al., Persons Coming Under the Juvenile Court Law. | B248161 (Los Angeles County Super. Ct. No. CK97539 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> L.F., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Jacqueline Lewis, Juvenile Court Referee.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Jessica S. Mitchell, Associate County Counsel, for Plaintiff and Respondent.

_____

L.F. (mother) appeals the jurisdiction and disposition orders in the dependency case filed on behalf of A.F. and J.F. (the minors).  She contends:  (1) there is insufficient evidence that she posed a risk of harm to the minors under section 300, subdivision (b) of the Welfare and Institutions Code;[1] and (2) even if there was a basis for jurisdiction, the juvenile court should have exercised its discretion to order informal supervision by the Department of Children and Family Services (Department) in lieu of adjudicating the minors dependents.

We find no error and affirm.

## FACTS

A.F., a girl, was born in November 2007.  J.F., a boy, was born in July 2009.  Mother and Jorge F. (father) separated in April 2012.  The minors lived with mother and saw father during scheduled weekend visits.  Mother worked on weekends from 10:00 p.m. to 5:00 a.m. as a security guard.  Father asked mother who was watching the minors while she was at work on weekends and they were in her custody.  She refused to tell him.

Third parties reported that people had spoken to mother and father about yelling at each other, and at the minors.  It appeared to third parties that mother was trying to alienate the minors from father.  Third parties regularly saw the minors go to neighbors' homes without supervision.  Later, when J.F. was interviewed by an investigator, he stated that A.F. and he go to "Marty's" house next door, and mother does not go with them.  According to J.F., "no one" watched A.F. and him when they went outside.  When mother was interviewed, she said Marty was father's friend and considered an uncle to the minors.  She said the minors only went to Marty's house when it was prearranged.  A neighbor named Martin G. (who is presumably "Marty") backed up mother's statement.  He said that the minors only went to his house when mother called first.  Further, he

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

indicated that when he knew the minors were coming over, he would wait outside on the porch and watch them walk from mother's house to his door.

One day, while mother was in the shower, J.F. heated a "Cup of Noodles Soup" in the family's microwave oven. After he removed it from the microwave, he had an argument with A.F. about the soup and some of the liquid spilled onto A.F.'s abdomen. She received second degree burns over 2 percent of her body. Mother called 911, and A.F. was treated at an emergency room. Mother did not inform father of the incident. After he learned about it from a social worker, he called mother. She would not return his calls.

Mother took A.F. to a follow-up appointment with her primary care physician on August 31, 2012, at the Los Angeles County/USC Medical Center. According to the medical center, mother did not keep A.F.'s appointment on September 6, 2012. Mother told the social worker that she did keep that appointment, and that A.F. was released with no follow-up scheduled.

A social worker visited the family home and observed that the minors had access to cleaning solutions and disinfectants under the sink, and to cutting knives. They could access the microwave with a step stool. Mother agreed to place the chemicals and knives in a different location. But when she was told to move the step stool, she said that it did not matter if J.F. climbed onto the sink.

A.F. was referred to the Regional Center for Speech due to a speech delay, but mother did not take her for any services. When the social worker advised mother that A.F. needed appropriate services, mother made excuses as to why she was not eligible for any programs. The social worker said that A.F. might be able to get services at Head Start, and mother promised to follow up.

During the social worker's visit, the minors went to the next door neighbor's home without supervision. The social worker went to the neighbor's home and tried to speak to the minors. A.F. appeared to have a speech deficit. Though she engaged in conversation with mother and the neighbor, A.F. was unintelligible to the social worker. J.F. was on the neighbor's lap and did not want to engage with the social worker. The social worker

3

had to obtain mother's assistance in getting the minors to finally return home.  A visual inspection of the minors revealed that A.F.'s burn area was bandaged and J.F. had some old scratches.

Father reported that he had been the minors' primary caregiver when he lived in the family home.  He had cooked and cared for them.  During the day, while he was at work, mother slept and left the minors unattended.  She got angry with the minors if they disturbed her sleep.

On September 2, 2012, mother reported that father tried to take a computer from the family home.  Father's story was different.  He claimed that when he was returning the minors after a visit, they were crying because they did not want to go back to mother, and mother got angry.

The next day, a third party reported that mother had been heard screaming at the minors, using obscenities and calling them names like "dog."  Mother had been observed pulling J.F. by the shirt to get him inside the home when he did not want to leave father.  The minors had been seen walking alone in the street and going to the homes of neighbors to get food.

A few weeks later, a social worker visited the family.  The social worker told mother that A.F. should attend a pre-school or a children's program, and that mother should discuss A.F.'s speech delay with her primary care physician.  Mother received a list of community resources, and was told that J.F. should also be in a children's program.  During the visit, the social worker observed that mother had put a lock on the cabinet under the sink and moved the knifes, but she had not moved the microwave.  The social worker reiterated the concern about the minors having access to the microwave, and mother moved it to an appropriate location.  In addition, the social worker wanted mother to ask the minors' babysitter to provide extended hours of care while mother was sleeping during the day.  Mother reported that she would discuss the matter with the babysitter.  The social worker observed that the minors were aggressive with each other; J.F. would attack A.F. because of a toy, and he would slap, hit and push her.  Mother did not intervene except to redirect the minors' attention.  Though mother had made an

4

appointment with A.F.'s primary care physician, mother said she was having problems with medical insurance.

On September 21, 2012, the social worker received a call from a third party who reported that he had heard mother yelling at the minors and calling them names. The third party said he had witnessed the minors walking unattended to a neighbor's home. He did not report it to the police because he did not want to cause the family any trouble. About three weeks later, the social worker spoke with a third party who was concerned that mother was unable to adequately care for the minors after working an all night shift. The third party stated: the minors had scratches or marks on their faces; mother might be treating A.F.'s wound in an inappropriate manner; the minors appeared hungry; they did not want to eat cooked food and instead cried for candy, junk food and frozen dinners; mother did appear to be putting the minors in the correct safety seats; and mother would allow the minors to exit on the driver's side of her car when it was double parked.

Sometime in October or November, mother began leaving the minors with E.E. (maternal grandmother) on weekends when father did not have visitation.

On October 19, 2012, the social worker visited. Mother reported that A.F. was on a waiting list to start school, and that A.F. was not eligible for any programs. Mother was unable to provide any information about the school. The social worker observed that the minors were aggressive and uncontrollable. A.F. picked up a toy. J.F. grabbed the toy and hit A.F. in the face with it. Mother explained that the minors' behavior was caused by father. She redirected J.F.'s attention but did not console A.F. During the visit, mother wanted to talk about custody issues and her relationship with father. She also wanted to discuss father's financial obligations. The social worker kept redirecting mother to the minors' well-being. After the social worker left the family home, she sat in her car and wrote notes. She saw A.F. walk out the front door, through the gate to the yard and proceed down the street. In the social worker's opinion, mother could not see A.F. because all of the windows in her house had coverings. A.F. knocked on the door of a neighbor who did not have children and waited for two minutes and appeared disappointed when there was no answer. The social worker made eye contact with A.F.

5

and motioned for her to return home. She did so, but appeared reluctant. After she went back home, the social worker confronted mother. She lied and said she had been on the porch watching the whole time.

In early November 2012, the social worker confirmed that A.F. was enrolled in elementary school. Her teacher had referred her to the school psychologist, who opined that A.F. was developmentally disabled. As a result, A.F. began seeing specialists for behavior, speech and learning deficits.

At a Team Decision Making meeting, mother and father agreed to participate in voluntary family maintenance services, and mother agreed to obtain childcare to supervise the minors while she was working and sleeping. In addition, mother agreed that J.F. would benefit from preschool.

About two months later, in January 2013, the Los Angeles Police Department (LAPD) received a report that a witness observed a 30-year old female assaulting her three-year old and five-year old children by grabbing and pulling them by their hair at a Ralph's Supermarket in Monterey Park, California. The woman matched mother's description and was driving a car registered to mother. An LAPD officer went to mother's home but no one answered the door.

On January 16, 2003, a social worker went to the family home to discuss the voluntary plan. Mother would not let the social worker inside, claiming that the minors were sick and asleep. When the social worker reminded mother of the case plan, mother said she had been told the case was closed. She also denied agreeing to a voluntary contract with the Department. The social worker showed mother a signed copy of the contract, and only then did she acknowledge it. The next day, mother called the Department and said she did not want services, and that she had signed the contract only because she felt threatened. Once she was told the reason for the services, mother agreed she would participate.

On January 16, 2013, the social worker went to the family home for a scheduled visit. Once again, she was denied access by mother. However, mother signed another voluntary contract for services after being told that the services would include parenting

6

and age appropriate development. That same day, mother contacted the Los Angeles County Board of Supervisors (Board of Supervisors) and reported that she was threatened into signing the contract and was never told about the services. She told the Board of Supervisors she did not want to participate.

The next day, the social worker contacted mother to confirm that she was not willing to participate in voluntary services. Mother began ranting and demanded the names of the third parties who called in reports. She claimed that her attorney and she were being harassed by the Department.

A follow up with A.F.'s school revealed that she had seven absences and was tardy on seven occasions. Also, she had problems focusing and would not sit in her chair. She appeared to have developmental delays and was referred for psychological testing. According to the school, she had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD). School staff was concerned about mother's parenting skills, and also about A.F. not meeting academic benchmarks, bruises on her face and scratches she claimed were from "the little brother." The school suggested that mother attend parenting classes.

Mother lodged various complaints against the social worker.

Throughout the investigation, mother showed signs of instability and displayed poor attention and decisionmaking, she was distractible, and she appeared to have a defective sense of reality. As a result, the Department concluded that mother was unable to provide adequate care and protection for the minors, and that she was minimizing the severity of the situation. For example, she was unable to comprehend potential risks; she appeared confused and overwhelmed when questioned; she appeared to lack an understanding of options; and she failed to follow through with decisions, reversed decisions or simply avoided making decisions. And with respect to the conflict between A.F. and J.F., mother blamed A.F.

The Department detained the minors, placed them with father, and then filed a petition alleging counts under, inter alia, section 300, subdivision (b) stating that the minors were at risk of harm based on the burn suffered by A.F., the lack of supervision

7

while A.F. walked to a neighbor's house, the lack of supervision while the minors were wandering around outside, and mother's maintenance of a microwave oven that the minors could access.

On February 14, 2013, A.F. was examined. It was determined that she had a language deficiency.

When J.F. was interviewed, he said he did not want to live with mother. Maternal grandmother was interviewed and stated that both mother and father were at fault for letting Marty, an older man, watch the minors without supervision. She thought it was inappropriate for young children, especially a young girl, to be left in the care of an adult male. She talked to mother about leaving the minors in the homes of their neighbors but did not know if mother put an end to it. During her interview, Ald.F. (paternal grandmother) had no knowledge of mother's current care for the minors. However, she reported that she resided with mother and father before the separation and observed that mother frequently yelled at the minors, and that she became easily frustrated with them. E.S., a neighbor, reported that he had seen the minors go to Marty's house without mother. When he asked the minors where mother was, they said, "in the house." He indicated that "mother is verbally abusive toward the [minors,] telling them they act like dogs."

On March 14, 2013, the juvenile court held a combined jurisdiction and disposition hearing. It received the Department's jurisdiction report into evidence, and all of the attachments. The parties did not call any witnesses. Both sides were permitted to argue. Mother's counsel urged the juvenile court to dismiss the petition. In the alternative, he asked the juvenile court to order informal supervision under section 360, subdivision (b) instead of adjudicating the minors dependents.

The juvenile court dismissed counts under section 300, subdivisions (a) and (j). It sustained two counts under section 300, subdivision (b) and stated that it saw this as a "case of severe neglect of the children by their mother on many different occasions, which resulted in significant burns to one of the children." Regarding disposition, the juvenile court found by clear and convincing evidence that there was substantial danger

8

to the minors if they remained in mother's custody, and there was no reasonable means to protect them absent removal.  It ordered the minors removed and placed in father's custody.

This timely appeal followed.

## DISCUSSION

### I.  The Juvenile Court Properly Exercised Dependency Jurisdiction.

Mother argues that the jurisdictional finding under section 300, subdivision (b) must be reversed.  We disagree.  In arriving at this conclusion, we dismiss mother's contention that there was insufficient evidence that the minors were at risk of harm at the time jurisdiction was exercised.  (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649 [a juvenile court's finding of jurisdiction under section 300 is reviewed under the substantial evidence test].)

Among the descriptions of a dependent child in section 300 is this:  "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment[.]"  (§ 300, subd. (b).)  A petition under section 300, subdivision (b) must show (1) neglectful conduct by the parent resulting in the parent's failure or inability to adequately supervise or protect the child; (2) causation; and (3) serious physical harm or illness to the minor, or a substantial risk of such harm or illness.  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 184.)

The "consensus of the courts . . . has been that a court cannot exercise dependency jurisdiction under [section 300, subdivision (b)] where the evidence shows a lack of current risk.  [Citations.]"  (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1023 (*J.N.*), citing to *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 (*Rocco M.*); *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1395–1396; *In re David M.* (2005) 134 Cal.App.4th 822, 829.)  Breaking from this consensus, Division Seven of this District decided *In re J.K.* (2009) 174 Cal.App.4th 1426 (*J.K.*) and

held that jurisdiction may be "based on a prior incident of harm or a current or future risk." (*Id.* at p. 1435, fn. 5.) The *J.K.* court explained that the holdings in cases such as *Rocco M.* were based on a prior statutory schemed that focused solely on present unfitness of a home and the present needs of a child. (*J.K.*, *supra*, at p. 1436.) Weighing in on the matter, *J.N.* disagreed with *J.K.* because the last sentence in section 300, subdivision (b) requires immediate dismissal of a petition in the absence of future risk. (*J.N.*, *supra*, 181 Cal.App.4th at p. 1023.) But then Division Three of this District cited *J.K.* and held that "proof of current risk of harm is not required to support the initial exercise of dependency jurisdiction under section 300, subdivision (b), which is satisfied by a showing the child *has suffered* or there is a substantial risk that the child will suffer, serious physical harm or abuse. [Citations.]" (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.) Thus, there is a split of authority as to whether a current risk of harm must be shown.

Mother urges us to follow *J.N.* We need not pick a side—*J.N.* or *J.K.*—in the debate over the meaning of the statutory scheme. In our view, there was sufficient evidence of a current risk of physical harm or illness. The Department's investigation revealed that mother had a pattern of neglecting the minors. She allowed them to wander around outside the family home without supervision on such a consistent basis that a social worker witnessed this neglect first hand, and third parties called the Department to report the neglect on multiple occasions. This lack of supervision exposed the minors to being injured by cars, animals and kidnappers as well as a plethora of other dangers that a young child could not be expected to navigate. Mother claimed that she watched from the porch on the day the social worker witnessed A.F. walking to a neighbor's house, and Martin G. said he always watched the minors when they walked to his house, but at most that is conflicting evidence giving rise to the inference that the minors were supervised when outside, and it cannot be given credit in our review of the sufficiency of the evidence. (*In re Kristen H., supra,* 46 Cal.App.4th at p. 1649 ["'[a]ll conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible'"].) In addition, the record suggested that mother would not amend

10

her behavior. She lied to the social worker about watching A.F. walk to the neighbor's house and she was resistant to services, even refusing the social worker access to the family home on several occasions. When she denied the social worker access to the home, there is a reasonable inference that she was hiding some form of neglect, such as the minors being absent without supervision. Last, we note that she expressed no remorse over her parenting deficiencies. Instead, she continually denied that she left the minors unattended.

In our view, the finding of a risk of harm was bolstered by mother's neglectful conduct in other areas. She displayed a lack of understanding of risks in the home when she allowed the minors access to the microwave oven without supervision, and she displayed a lack of focus on the welfare of the minors when she missed medical appointments for A.F., failed to be proactive about getting A.F. services and enrolled in school, resisted voluntary services, resisted the social worker's home visits, complained about the social worker and father, and demanded to know the identities of third parties who had reported abusive or neglectful conduct. Beyond that, mother was abusive toward the minors by calling them names and yelling at them, and by grabbing and pulling them by the hair in public.

## II. The Juvenile Court did not Abuse its Discretion when it Declined to Order Informal Supervision by the Department in Lieu of Adjudicating the Minors Dependents.

Mother contends that the juvenile court erred when it declared the minors dependents instead of employing the alternative set forth in section 360, subdivision (b). This contention lacks merit.

"Once the juvenile court finds jurisdiction under section 300, it must adjudicate the child a dependent unless the severity of the case warrants nothing more than [the Department's] supervision of family maintenance services. Under section 300, subdivision (b), if appropriate, the court may, without adjudicating the child a dependent, order that services be provided to keep the family together under the informal supervision of the child welfare agency. [Citations.] [¶] Whether to exercise this option under

11

section 360, subdivision (b), is a discretionary call for the juvenile court to make; it may opt to do so, but it need not. 'The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion.' [Citation.] As an appellate court, we cannot reverse the court's dispositional order absent a clear abuse of discretion. [Citation.] A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason. [Citation.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.)

The record reveals that mother exhibited resistance to services, lack of respect for the social worker, lack of common sense about parenting, denial of the risks to the minors' safety and welfare, and no remorse. Thus, we easily conclude that informal supervision under section 360, subdivision (b) would not have severed the minors' best interests. Consequently, the record demonstrates that when the juvenile court ruled, it was well within the bounds of reasons.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
        ASHMANN-GERST

We concur:


_____, P. J.
      BOREN


_____, J.
      CHAVEZ